Steve W. Berman (*pro hac vice*)
HAGENS BERMAN SOBOL SHAPIRO LLP
1918 Eighth Avenue, Suite 3300
Seattle, WA 98101
Tel.: 206.623.7292
Fax: 206.623.0594
Email: steve@hbsslaw.com

Christopher R. Pitoun (SBN 290235)
301 N. Lake Ave., Suite 920
Pasadena, CA 91101
Tel.: 213-330-7150
Fax: 213-330-7512
Email: christopherp@hbsslaw.com

*Attorneys for Plaintiffs*
[Additional Counsel Listed on Signature Page]

## UNITED STATES DISTRICT COURT

## CENTRAL DISTRICT OF CALIFORNIA

| | |
|---|---|
| JANE DOE J.L., JANE DOE L.K., JANE DOE K.M., JANE DOE A.S., JANE DOE A.D., JANE DOE S.A., JANE DOE L.R., JANE DOE R.K., BETSAYDA ACEITUNO, JANE DOE K.P., JANE DOE C.C., <br><br> Plaintiffs, <br><br> v. <br><br> UNIVERSITY OF SOUTHERN CALIFORNIA, BOARD OF TRUSTEES OF THE UNIVERSITY OF SOUTHERN CALIFORNIA, and GEORGE TYNDALL, M.D., <br><br> Defendants. | No. 2:18-cv-06115 <br><br> <u>CLASS ACTION</u> <br><br> CLASS ACTION COMPLAINT <br><br><br> **JURY TRIAL DEMANDED** |

CLASS ACTION COMPLAINT

003211-11 1040903 V1

1

## TABLE OF CONTENTS

2

Page

3    I.    INTRODUCTION ............................................................... 1

4    II.   JURISDICTION AND VENUE .......................................... 2

5    III.  THE PARTIES ................................................................... 2

6          A.    Plaintiffs ................................................................. 2

7          B.    Defendants .............................................................. 3

8    IV.   FACTS ............................................................................... 4

9          A.    Students (and their parents) entrusted their medical care to
10               USC. ........................................................................ 4

11         B.    Tyndall's and USC's abuse of trust ........................ 6

         C.    Patients complained about Tyndall's behavior to USC and
12               refused to be scheduled with him again. ................ 9

13         D.    USC admits it was on notice of Tyndall's violation of female
14               students. ................................................................ 11

         E.    Plaintiffs were violated by Dr. Tyndall, with the knowledge
15               of USC. .................................................................. 14

16               1.    Jane Doe J.L. (1991-1993) ........................... 14

17               2.    Jane Doe L.K. (1996-1997) ........................... 15

18               3.    Jane Doe K.M. (2000-2001) .......................... 15

19               4.    Jane Doe A.S. (2000-2001) ........................... 17

20               5.    Jane Doe A.D. (2006) .................................... 18

21               6.    Jane Doe S.A. (2008) .................................... 19

22               7.    Jane Doe L.R. (2008) .................................... 20

23               8.    Jane Doe R.K. (2009) .................................... 22

24               9.    Betsayda Aceituno (2013-2015) .................... 24

25               10.   Jane Doe K.P. (2013) .................................... 24

26               11.   Jane Doe C.C. (2014) .................................... 25

27         F.    The statute of limitations is tolled based on the continuing
               violations doctrine and fraudulent concealment. ... 26
28

003211-11 1040903 V1

V.     CLASS ALLEGATIONS ..................................................................... 29

VI.    CAUSES OF ACTION ...................................................................... 31

COUNT I  VIOLATONS OF TITLE IX, 20 U.S.C. § 1681(A), *ET SEQ*.
        (AGAINST USC AND USC TRUSTEES).......................................... 31

COUNT II   VIOLATION OF THE CALIFORNIA EQUITY IN
        HIGHER EDUCATION ACT [CAL. EDUC. CODE § 66250]
        (AGAINST USC, USC TRUSTEES, AND TYNDALL)................................ 31

COUNT III  GENDER VIOLENCE [CAL. CIV. CODE § 52.4]
        (AGAINST TYNDALL AND USC) ................................................ 32

COUNT IV  GROSS NEGLIGENCE (AGAINST USC, USC
        TRUSTEES, AND TYNDALL) .................................................... 33

COUNT V  NEGLIGENT SUPERVISION AND RETENTION
        (AGAINST USC AND USC TRUSTEES).......................................... 34

COUNT VI  CIVIL BATTERY (AGAINST TYNDALL AND USC) .................... 35

COUNT VII  INTENTIONAL INFLICTION OF EMOTIONAL
        DISTRESS (AGAINST TYNDALL AND USC)...................................... 36

COUNT VIII  NEGLIGENT INFLICTION OF EMOTIONAL
        DISTRESS (AGAINST TYNDALL AND USC)...................................... 37

COUNT IX  RATIFICATION (AGAINST USC AND USC TRUSTEES)............. 39

PRAYER FOR RELIEF ............................................................................. 39

003211-11 1040903 V1

Plaintiffs, individually and on behalf of all women who received a medical examination from Dr. George Tyndall at the University of Southern California, alleges as follows:

## I.     INTRODUCTION

1.     Trust is an essential part of the relationship between physician and patient. "Without trust, how could a physician expect patients to reveal the full extent of their medically relevant history, expose themselves to the physical exam, or act on recommendations for tests or treatments?"[1]

2.     George Tyndall, M.D., violated this trust by taking advantage of female students who sought examination by a gynecologist at the University of Southern California's ("USC") student-health center. Tyndall used his position of trust to put women in a place of complete vulnerability: naked or partially unclothed in a closed examination room with the expectation that physical contact would occur for medical treatment in accordance with the standard of care.

3.     Tyndall violated this trust and his female patients by causing physical contact, including in the form of sexual abuse, molestation, and unwanted touching that was not for the purpose of providing medical care, but for the purpose of providing Tyndall with sexual gratification.

4.     USC violated its female students' trust by knowingly putting women in the room for treatment by Tyndall, knowing that inappropriate physical contact and violations would occur. In fact, USC nurses, chaperones, and other staff members were regularly present in the examination rooms, observed the inappropriate sexual molestation, and took no steps to stop it as it occurred.

5.     Moreover, even as numerous supervisors and administrators became aware of Tyndall's harmful conduct, USC failed to act to protect its female students by

---

[1] Susan Dorr Goold, MD, MHSA, MA, *Trust, Distrust and Trustworthiness: Lessons from the Field*, 17 J. GEN. INTERNAL MED. 79, 79–81 (2002) (citations omitted).

removing Tyndall from his position even though it was clear he was unfit to treat patients.

6.     Defendants' sexual abuse, molestation, and unwanted sexual touching and contact have caused widespread damage to Plaintiffs and the Class, for which Defendants must be held responsible.

## II.     JURISDICTION AND VENUE

7.     This Court has subject-matter jurisdiction pursuant to 28 U.S.C. § 1331, because this action arises under the laws of the United States. This Court also has subject-matter jurisdiction pursuant to the Class Action Fairness Act of 2005, 28 U.S.C. § 1332(d)(2), because this is a class action, including claims asserted on behalf of a nationwide class, filed under Rule 23 of the Federal Rules of Civil Procedure; there are dozens, and likely hundreds, of proposed Class members; the aggregate amount in controversy exceeds the jurisdictional amount or $5,000,000.00; and Defendants are citizens of a state different from that of Plaintiffs and members of the Class.

8.     Venue is proper in this District under 28 U.S.C. § 1391 (a)-(d) because, *inter alia*, substantial parts of the events or omissions giving rise to the claim occurred in the District and/or a substantial part of property that is the subject of the action is situated in the District.

## III.     THE PARTIES

### A.     Plaintiffs

9.     Jane Doe J.L. is a resident of Bellevue, Washington, and a citizen of the United States.

10.     Jane Doe L.K. is a resident of San Francisco, California, and a citizen of the United States.

11.     Jane Doe K.M. is a resident of Rosemead, California, and a citizen of the United States.

12.     Jane Doe A.S. is a resident of Fountain Valley, California, and a citizen of the United States.

13.     Jane Doe A.D. is a resident of Los Angeles, California, and a citizen of the United States.

14.     Jane Doe S.A. is a resident of Chicago, Illinois, and a citizen of the United States.

15.     Jane Doe L.R. is a resident of San Marcos, California, and a citizen of the United States.

16.     Jane Doe R.K. is a resident of Costa Mesa, California, and a citizen of the United States.

17.     Betsayda Aceituno is a resident of Los Angeles, California, and a citizen of the United States.

18.     Jane Doe K.P. is a resident of Los Angeles County, California, and a citizen of the United States.

19.     Jane Doe C.C. is a resident of Dallas, Texas, and a citizen of the United States.

**B.      Defendants**

20.     Defendant USC's principal place of business is in Los Angeles County, California.

21.     As a private corporation, USC is governed by the Board of Trustees of The University of Southern California, which has approximately 55 voting members. The board is a self-perpetuating body, electing one-fifth of its members each year for a five-year term of office. Hereinafter, USC and the Board of Trustees will be referred to collectively as the USC Defendants.

22.     Defendant George Tyndall, M.D., is an adult male who is a resident of Los Angeles County and citizen of the United States. Tyndall started working as a

- 3 -

gynecologist at USC's student-health center in or about 1989, and reportedly examined as many as 16 women per day at the clinic.

## IV.   FACTS

**A.    Students (and their parents) entrusted their medical care to USC.**

23.    Experts have asserted that health is an important factor for academic achievement in higher education.[2]  "Health complaints limit students' capacity to perform adequately at university."[3] Thus, a university's promotion of health and well-being of its students promotes effective learning.[4]

24.    To that end, USC touts the services of its student-health center to its students.  It regularly runs workshops designed to invite the trust of students, such as a series of "Feel Better Workshops" entitled "Relationships and Connection," "Addressing Academic Anxiety," "Stress Management," and "Calm Your Anxiety."[5]

25.    Women are encouraged to start seeing a gynecologist once a year when they turn 18 years old.[6] Thus, many of the women who are examined at USC's student-health center have never had a gynecological examination before.[7]

---

[2] Walid El Ansari & Christiane Stock, *Is the Health and Wellbeing of University Students Associated with their Academic Performance?*, 7 INT'L J. ENVTL. RES. PUB. HEALTH 509, 509–527 (2010) (citations omitted).

[3] *Id.*

[4] *Id.*

[5] USC Student Health, *Upcoming Events*, https://engemannshc.usc.edu/events/ (last accessed May 19, 2018).

[6] 4CollegeWomen, *The First Gynecological Exam*, http://www.4collegewomen.org/fact-sheets/firstgyno.html (last accessed May 21, 2018).

[7] Harriet Ryan et al., *A USC doctor was accused of bad behavior with young women for years. The university let him continue treating students*, L.A. TIMES (May 16, 2018), https://www.latimes.com/local/california/la-me-usc-doctor-misconduct-complaints-20180515-story.html.

26.     The primary care team at USC's student health center "is available for contraception counseling, well-women visits, pap smears, STI testing, and other concerns women may have."[8]

27.     USC's invitation to its female students to discuss concerns about their health presumes a relationship of trust.

28.     Trust is essential to both physician and patient.[9] "Without trust, how could a physician expect patients to reveal the full extent of their medically relevant history, expose themselves to the physical exam, or act on recommendations for tests or treatments?"[10]

29.     "Presumed consent is a critical manifestation of trust that makes possible much of routine doctor visits."[11] Absent a presumption of trust, patients might avoid essential medical care.[12]

30.     "Important as it is to measure trust in individual clinicians and the actions and circumstances that affect it, it is equally important, in today's health system, to study (empirically and normatively) trust and trustworthiness in organizations and institutions."[13]

31.     Knowing and inviting female students to place trust in its physicians, USC had a duty to ensure that Tyndall used his trusted position and the safe confines of a doctor's exam room at the USC student-health center consistent with the standard of care and certainly not to abuse that trust through the molestation of students.

---

[8] Eric Cohen Student Health Center of USC, *Women's Health*, https://ecohenshc.usc.edu/medical/womens-health/ (last accessed July 13, 2018).

[9] Dorr Goold, *supra* note 1.

[10] *Id.*

[11] *Id.*, citing Ruth Faden & Tom Beauchamp, A HISTORY AND THEORY OF INFORMED CONSENT 274–80 (Oxford Univ. Press 1986).

[12] *Id.*

[13] *Id.*

- 5 -

**B.     Tyndall's and USC's abuse of trust**

32.     For nearly 30 years, the University of Southern California's student-health clinic's only full-time gynecologist was Tyndall. USC hired Tyndall in 1989 after his residency.

33.     According to the first report to expose Tyndall and USC, Tyndall used his position of trust to forego the standard of care. For example, in the exam room, Tyndall was typically accompanied by a female nurse or medical assistant known as a chaperone—a practice embraced by many male gynecologists.[14]

34.     In the years after Tyndall started, some chaperones reportedly became alarmed about the frequency with which he used a camera during pelvic exams.[15] Tyndall's chaperones questioned his motivations, with one reporting he took multiple pictures of hundreds of patients' genitals, while another said she witnessed 50 to 100 patients photographed.[16]

35.     According to the Los Angeles Times, Bernadette Kosterlitzky, a clinic nurse from 1992 to 2013, said that after a chaperone alerted administrators to the camera, then-Executive Director Dr. Lawrence Neinstein ordered it removed.[17]

36.     In fact, a member of the USC student-health center's oversight committee purportedly admitted that: (i) in the early 2000s, several students submitted letters concerning inappropriate touching and remarks by Tyndall; and (ii) those complaint letters were read aloud during monthly committee meetings.[18]  One member of the committee confronted Tyndall, and that confrontation is allegedly contained in university records that corroborate his accounts.[19]

---

[14] Ryan et al., *supra* note 7.

[15] *Id.*

[16] *Id.*

[17] *Id.*

[18] *Id.*

[19] *Id.*

- 6 -

37.     After USC's grand opening of its new Engemann Student Health Center in or about 2013, chaperones became concerned regarding Tyndall's treatment of female patients.

38.     Chaperones were concerned about "full body scans," where "Tyndall frequently had women lie naked on the exam table while he slowly inspected every part of their body, down to the area between their buttocks."[20]  While a woman's annual gynecological visit might include a discussion of skin problems, such "meticulous" inspections of a patient's naked body "would be highly unusual if not inappropriate."[21]

39.     While Tyndall conducted examinations, he made comments that the nursing staff found "unseemly," describing patients' skin as "flawless," "creamy" or "beautiful." He told students they had "perky breasts."[22]

40.     In the spring of 2013, eight chaperones reported concerns about Tyndall to their supervisor, veteran nurse Cindy Gilbert. Gilbert went to Neinstein, the clinic's executive director, and the then-head of clinic nursing and now the clinic's executive director, Tammie Akiyoshi. Gilbert said Neinstein told her that he had talked to Tyndall about his behavior in the past.[23]

41.     Neinstein reportedly referred the complaints to the university's Office of Equity and Diversity, which investigates sexual misconduct and racial and gender discrimination. USC has stated that an investigator interviewed seven employees and a patient. However, Gilbert and multiple chaperones who complained said they were never informed of the probe or questioned by the investigator.[24]

---

[20] *Id.*

[21] *Id.*

[22] *Id.*

[23] *Id.*

[24] *Id.*

003211-11 1040903 V1

42.     The investigation apparently concluded there was no violation of school policy. The only action that Neinstein took was to bar Tyndall from locking the door of his office when patients were present.[25]

43.     Tyndall then increased his attempts to groom patients, particularly of Chinese ethnicity.[26]

44.     In his office, Tyndall had a map of China and encouraged women to point out their home province. He kept a bamboo plant, the traditional Chinese symbol of longevity and vitality, on a shelf above his desk. He sometimes showed off a photo of his Filipina wife and shared details of their relationship.[27]

45.     In addition to grooming, Tyndall took steps to require patients to return for appointments more often. For example, while most physicians will prescribe one year's worth of birth control pill refills, Tyndall would only prescribe two months. He would not extend the prescription until the patients returned for another examination.[28]

46.     However, as Tyndall's grooming efforts increased, so did the chaperones' concerns.

47.     Chaperones began discussing the way Tyndall used his fingers at the outset of the pelvic exam for many young women. Before inserting a speculum, the metal duck-billed device that spreads open the walls of the vagina and enables the doctor to view the cervix, Tyndall would voice concern that the speculum might not fit.[29]

48.     The Los Angeles Times reported:

> "He would put one finger in and say, 'Oh, I think it will fit. Let's put two fingers in,'" said a chaperone who worked with Tyndall for years. Four people familiar with Tyndall's

---

[25] *Id.*

[26] *Id.*

[27] *Id.*

[28] *Id.*

[29] *Id.*

exams said that while he spoke, he was moving his fingers in and out of the patients.

They said he made nearly identical statements to hundreds of women as he probed them: My, what a tight muscle you have. You must be a runner.

The chaperone who worked with Tyndall for years said she witnessed at least 70 such exams and remembered thinking the physician would eventually become embarrassed about repeating the same words to student after student.

"He never was," she said.

During some exams, Tyndall made explicit reference to sexual intercourse while his fingers were inside patients, according to five people who heard the remarks or were told about them.

"He would tell young ladies their hymens are intact. 'Don't worry about it, your boyfriend's gonna love it,'" a chaperone recalled.[30]

49.     The chief of Female Pelvic Medicine and Reconstructive Surgery at University Hospitals Cleveland Medical Center, Dr. Sangeeta Mahajan, has stated that she has never heard of a gynecologist moving his fingers in and out of a vagina to determine whether a speculum fit, calling it "very odd" and "creepy."[31]  An assistant professor of gynecology at Harvard Medical School, Dr. Louise King, said the practice was not standard.[32]

## C.     Patients complained about Tyndall's behavior to USC and refused to be scheduled with him again.

50.     One nurse said that in 2013-2014, she spoke to at least five women who refused to be scheduled with Tyndall despite having gynecological problems that needed immediate attention.  The patients reported feeling like "he was inappropriately touching them, that it didn't feel like a normal exam," and "like they

---

[30] *Id.*

[31] *Id.*

[32] *Id.*

were violated." The nurse told her immediate supervisor and later Akiyoshi, the head of nursing, who said they would look into it.[33]

51.     During the 2013-2016 period, one clinician received unsolicited complaints from at least three students who said they would never see Tyndall again. The clinician gave the students the email addresses for administrators and encouraged them to put their complaints in writing.[34]

52.     Having already felt uncomfortable on how Tyndall violated her with his hand during a gynecological exam before the speculum was inserted, one student was told on her second visit that Tyndall wanted her to remove all her clothes. After waiting for Tyndall naked, she got dressed, after asking herself why she needed to take off all her clothes. She told a female clinic employee she wanted to see another doctor. That employee reportedly told the student "there were a lot of complaints" about Tyndall.[35]

53.     Chaperones reported the names of women "who seemed particularly shaken" by Tyndall's exams to their supervisor, nurse Gilbert. Gilbert allegedly contacted patients and explained how to make a written complaint against the doctor. Some did, but others responded they just wanted to find another gynecologist and forget about the experience.[36]

54.     Gilbert stated she repeatedly expressed concerns about Tyndall to Akiyoshi, Neinstein, and other clinic administrators from 2014 to 2016, but they seemed uninterested.[37]

---

[33] *Id.*

[34] *Id.*

[35] *Id.*

[36] *Id.*

[37] *Id.*

- 10 -

55.     Chaperones forwarded some complaints about Tyndall to Sandra Villafan, who became the clinic's head of quality and safety in 2013. Villafan has stated she relayed any concerns to clinic administrators and university leadership, but was not privy to the outcomes of any investigations.[38]

56.     Finally, in 2016, Gilbert went to USC's rape crisis center, known as Relationship and Sexual Violence Prevention and Services, and spoke to Executive Director Ekta Kumar. That complaint (and the discovery of a box of film of women's genitalia in Tyndall's office) finally prompted the investigation that led to Tyndall's removal.[39]

**D.     USC admits it was on notice of Tyndall's violation of female students.**

57.     On May 15, 2018, USC issued a release titled "Summary of Coordinated Investigation of Student Health Physician" ("Statement") from Todd R. Dickey, Senior Vice President for Administration, Gretchen Dahlinger Means, Title IX Coordinator and Executive Director of the Office of Equity and Diversity, and Laura LaCorte, Associate Senior Vice President for Compliance.[40]

58.     The Statement admitted that, in June 2016, USC's Office of Equity and Diversity ("OED") received a complaint from a staff member at the student-health center regarding sexually inappropriate comments made to patients in front of medical assistants by Tyndall.[41]

59.     As a result, USC states that it conducted an investigation. USC reported that medical assistants who assisted Dr. Tyndall during clinic visits reported concerns

---

[38] *Id.*

[39] *Id.*

[40] Todd R. Dickey et al., USC, *Summary of Coordinated Investigation of Student Health Physician* (May 15, 2018), https://pressroom.usc.edu/files/2018/05/Summary-fact-sheet_5.15.18.pdf.

[41] *See id.*

- 11 -

about the way he conducted pelvic examinations. Specifically, these medical assistants questioned Tyndall's practice of a digital insertion prior to insertion of a speculum.[42]

60.     USC purportedly consulted with a gynecology expert who stated that this could be considered an acceptable practice, but then contracted with an outside medical review firm, MD Review, to review Dr. Tyndall's clinical practice. MD Review concluded that this examination practice was not the standard of care.[43]

61.     USC stated that, during its investigation, a box of clinical photos of cervixes and surrounding internal tissue allegedly from 1990-1991 was found during a search of Tyndall's office.[44]

62.     USC reported that it also reviewed the files of Dr. Larry Neinstein, the former health center director from 1995-2014 (who is now deceased), which showed earlier patient complaints about Tyndall, including complaints about his clinical practice. The files contained eight complaints logged between 2000 and 2014 that were concerning. These included racially insensitive and other inappropriate comments, concerns that he was not adequately sensitive to patient privacy, a complaint of feeling "uncomfortable," another that Tyndall "gave me the skeevies," and another that he was "unprofessional."[45]

63.     USC admitted that these complaints were sufficient to terminate Tyndall, and should have been elevated for "proper investigation."

64.     Dr. Neinstein's notes also purportedly indicated that he brought in outside experts to review his clinical practices, although the Statement does not identify those experts nor the results of those engagements.[46]

---

[42] *See id.*

[43] *See id.*

[44] *See id.*

[45] *See id.*

[46] *See id.*

- 12 -

65.     USC stated that OED had previously conducted a review in 2013 of complaints of inappropriate comments made by Tyndall raised by staff members, but that there was insufficient evidence to find a violation of university policy.[47]

66.     USC was silent on its failure to report Tyndall to criminal authorities, the attorney general, or anyone outside the university for the purposes of conducting an independent investigation.[48]

67.     USC concluded its 2016 investigation, finding that "Tyndall had violated the university's policy on harassment by making repeated racially discriminatory and sexually inappropriate remarks during patient encounters."  The Statement was silent as to any conclusions concerning sexual assault, violation, or molestation.[49]

68.     Ultimately, in 2017, the university began termination proceedings. However, USC did not contact law enforcement, the attorney general, or the medical licensing board.[50] Nor did USC inform Tyndall's patients.[51] Because Tyndall threatened a lawsuit against USC, USC entered into a separation agreement with Tyndall.[52]

69.     USC states that, once Tyndall sent a letter to USC asking to return to his position at the student-health center in 2018, USC finally made a report to the California Medical Board on March 9, 2018. According to USC, this was the first report to authorities it had made despite being on notice of Tyndall's behavior for decades.[53]

_____

[47] *See id.*

[48] *See id.*

[49] *See id.*

[50] *See id.*

[51] Ryan et al., *supra* note 7.

[52] *See* Statement, *supra* note 40.

[53] *See id.*

- 13 -

**E.      Plaintiffs were violated by Dr. Tyndall, with the knowledge of USC.**

**1.      Jane Doe J.L. (1991-1993)**

70.      Jane Doe J.L. attended USC from 1988-1993. She saw Dr. Tyndall for an examination in or about 1992 or 1993 due to a concern of a possible vaginal yeast infection.

71.      Dr. Tyndall examined Jane Doe J.L. without a chaperone in the room. Jane Doe J.L. was wearing a skirt/dress that day; Dr. Tyndall told her to remove her underpants for the examination. Dr. Tyndall did not ask Jane Doe J.L. to undress for the examination nor provide her with an examination gown.

72.      Dr. Tyndall examined Jane Doe J.L. with his fingers. As he was touching her, Dr. Tyndall asked if she had another female student perform oral sex on her. Jane Doe J.L. immediately said "no" and asked "why?" In response, Dr. Tyndall told her if a girl was licking her vagina, it may have caused her yeast infection. Jane Doe J.L. explained to Dr. Tyndall that she was heterosexual. Dr. Tyndall described for Jane Doe J.L. in detail how females perform oral sex on one another and asked if she was sure she had never done anything like that before.

73.      Jane Doe J.L. was very uncomfortable by the tone and subject matter of the conversation. She sat up after he was done touching her and quickly left the examination room.

74.      After the appointment, Jane Doe J.L. told her cousin she had a bad experience with Dr. Tyndall and that she was never going back to him again.

75.      When Jane Doe J.L. heard about the accounts of other women in his care, she realized she had not been a victim of an isolated occurrence, but rather the victim of a series of abuses. The distress she felt at the time of her examination came flooding back. She is upset and feels betrayed that USC allowed this to happen to her and so many other women.

76.     Jane Doe J.L. has thus been damaged by Dr. Tyndall's and USC's actions.

**2.     Jane Doe L.K. (1996-1997)**

77.     Jane Doe L.K. studied communications at USC from 1996 to 2000.

78.     In or about 1996 or 1997, Jane Doe L.K. was examined by Dr. Tyndall at the USC student health center.

79.     After the exam, and while Jane Doe L.K. was still partially unclothed, Dr. Tyndall began asking her questions about her genital piercing. Dr. Tyndall told Jane Doe L.K. that he was "conducting a study," and for the study, he needed to know whether it had been easier or more difficult for her to orgasm since she got the genital piercing.

80.     Jane Doe L.K. felt an immediate rush of panic—she did not think that doctors were supposed to ask questions like that. She felt extremely ashamed and violated. However, because she did not have much experience with gynecologists, she did not know for certain that the question was inappropriate. After all, Dr. Tyndall was an authority figure, so Jane Doe L.K. questioned whether she must be the one in the wrong for feeling embarrassed.

81.     Jane Doe L.K. is outraged that Dr. Tyndall was able to make her feel embarrassed and ashamed through his own misconduct.

82.     Jane Doe L.K. feels betrayed by USC and angry that it has subjected so many young, vulnerable women to the type of abuse she experienced more than two decades ago.

83.     Jane Doe L.K. has thus been damaged by USC's and Dr. Tyndall's actions.

**3.     Jane Doe K.M. (2000-2001)**

84.     Jane Doe K.M. attended USC from 1998 to 2000. She graduated with a B.A. in communications.

85.     In 2000 or 2001, Jane Doe K.M. scheduled an appointment with Dr. Tyndall at the USC student health center because her period was more than one week late. She took a pregnancy test and underwent pelvic and breast exams and a pap smear. It was her first visit to the gynecologist.

86.     Jane Doe K.M. had not previously undergone a pelvic exam.

87.     There was a chaperone in the room during Jane Doe K.M.'s exam. The chaperone stood with her back to Jane Doe K.M. and Dr. Tyndall throughout the exam and did not speak.

88.     Dr. Tyndall performed a breast exam on Jane Doe K.M. without explaining the process. He opened the gown exposing both breasts without notification. He did not tell Jane Doe K.M. that she could perform breast exams on herself at home. It seemed to Jane Doe K.M. as though the breast exam lasted a very long time, making her uncomfortable.

89.     During the course of the pelvic exam, Dr. Tyndall made numerous jokes about the instruments he was using on Jane Doe K.M. He did this while touching her. At one point, while the speculum was inside of Jane Doe K.M.'s vagina, Dr. Tyndall sarcastically asked if he could "please have his speculum back."

90.      Jane Doe K.M. felt as though Dr. Tyndall's joking unnecessarily prolonged the pelvic exam. Worse, she felt that his comments were highly inappropriate and violating. She left the appointment feeling compromised, exposed, and uncomfortable.

91.     Jane Doe K.M. felt so uncomfortable after the appointment that she confided in her friend and her boyfriend (now husband) about the experience

92.     Ever since her experience with Dr. Tyndall, Jane Doe K.M. has never felt safe being treated a male gynecologist. Many years later, Jane Doe K.M. was faced with a difficult decision about delivering her baby. Her female gynecologist would not be available to deliver her baby the week she was due, and as a result, she would have

- 16 -

a male doctor instead. But Jane Doe K.M. was still not comfortable with male gynecologists because of her experience with Dr. Tyndall. She elected to induce one week early so that her regular doctor—a woman—could deliver the baby.

93.   Jane Doe K.M. is angry that USC failed to protect her and so many others. She wants USC to be held accountable for breaching the trust of their young female students.

94.   Jane Doe K.M. has thus been damaged by USC's and Dr. Tyndall's actions.

**4.   Jane Doe A.S. (2000-2001)**

95.   Jane Doe A.S. saw Dr. Tyndall for a gynecological exam in or about 2000 or 2001. Prior to her appointment with Dr. Tyndall, she had never been examined by a gynecologist before.

96.   Jane Doe A.S. made an appointment for access to birth control and STD testing.

97.   Because it was her first experience with a gynecologist, Jane Doe A.S. did not know what to expect. Dr. Tyndall examined her without a chaperone in the room. Because of her age and relative inexperience, Jane Doe A.S. did not know to ask for one.

98.   Dr. Tyndall performed a pelvic exam and inserted his fingers into Jane Doe A.S.'s vagina. While his finger was inside of her, Dr. Tyndall claimed Jane Doe A.S. was "particularly tight." He also commented that she had a "beautiful vagina." Jane Doe A.S. found Dr. Tyndall's comments to be inappropriate and disturbing. At the time, Jane Doe A.S. felt uncomfortable, but because she had no prior experience with gynecologists, she did not know that Dr. Tyndall's methods were abnormal and inappropriate.

99.   When Jane Doe A.S. returned for her follow-up appointment to receive her STD test results from Dr. Tyndall, she instead was informed of her results by a

student/intern. She was told that she had genital herpes. Jane Doe A.S. lived with fear and unease about what she had been told for ten years, but never had any symptoms. She was later retested by another doctor and discovered she did not have genital herpes.

100.    Although all doctors since then have treated her with respect and professionalism, she continues to have unease and mistrust around male doctors and has since refused to have a male doctor perform a pelvic exam.

101.    When Jane Doe A.S. heard the reports about Dr. Tyndall in the media, she recognized that Dr. Tyndall had acted inappropriately while examining her and conveying her test results. She feels violated and is upset that USC failed to protect her.

102.    Jane Doe A.S. has thus been damaged by Dr. Tyndall's and USC's actions.

**5.    Jane Doe A.D. (2006)**

103.     Jane Doe A.D. attended USC from 2005-2010. She saw Dr. Tyndall for an examination in or about 2006, due to a concern regarding symptoms or a cold sore on her lip, and sought medication.

104.    Dr. Tyndall performed a pelvic exam (even though she was there because she had a cold sore on her lip). During the exam, he made the comment that she was "very tight." The comment made Jane Doe A.D. feel weird but, because of her age and inexperience, she did not really know how inappropriate it was at the time. She later told a friend about it, and the friend explained to her the sexual connotation associated with the comment.

105.    Jane Doe A.D. avoided going to the gynecologist after that. During the time she was not going to see an gynecologist, she developed two vaginal infections. She finally went to Planned Parenthood to get an exam and was prescribed

medications. However, Jane Doe A.D. has been extremely susceptible to vaginal infections ever since.

106.   When Jane Doe A.D. heard about the accounts of other women in his care, she realized she had not been a victim of an isolated occurrence, but rather the victim of a series of abuses. She is upset and feels betrayed that USC allowed this to happen to her and so many other women.

107.   Jane Doe A.D. recently requested the medical records from her visit with Dr. Tyndall and was shocked to read in Dr. Tyndall's notes a comment that she "said she can have orgasms with clitoral stimulation but not vaginal intercourse."  Jane Doe A.D. never discussed orgasms with Dr. Tyndall during the appointment. She is extremely embarassed that this information was included in her medical record because other doctors would presumably review Dr. Tyndall's record as part of her medical history.

108.   Jane Doe A.D. has thus been damaged by Dr. Tyndall's and USC's actions.

**6.    Jane Doe S.A. (2008)**

109.    Jane Doe S.A. made an appointment with Dr. Tyndall in or about spring of 2008. The doctor she regularly saw for women's healthcare at the student health center was out of town. Jane Doe S.A. made the appointment with Dr. Tyndall because she was having vaginal discomfort and needed to see someone right away.

110.   Dr. Tyndall performed a pelvic exam on Jane Doe S.A. There was a chaperone in the room during the exam.

111.   As Jane Doe S.A. was laying on the exam table, undressed from the waist down with her legs spread, Dr. Tyndall tapped on her labia several times with four fingers. "That's nice" he said, and then he asked Jane Doe S.A. if she had had laser hair removal. Jane Doe S.A. panicked. She tried to make eye contact with the chaperone, but the chaperone avoided her gaze. When she realized that the chaperone

was going to do nothing to help her, Jane Doe S.A. replied uncomfortably, "no, I just had a wax."

112.   After her examination by Dr. Tyndall, Jane Doe S.A. felt physically ill and violated. For months, she replayed the incident in her mind and felt humiliated for being touched by Dr. Tyndall and ashamed for not confronting him. She resolved never to see Dr. Tyndall again.

113.   Jane Doe S.A. later reported the incident to her regular gynecologist at the student health center, who did not seem surprised. The doctor strongly encouraged Jane Doe S.A. to file a complaint with the health center.

114.   Jane Doe S.A. wrote a letter of complaint to Dr. Lawrence Neinstein, the executive director of the student health center at the time. She received an email back from Dr. Neinstein, thanking her for bringing it to his attention and assuring her that the health center would address her complaint.

115.   When Jane Doe S.A. read news reports of Dr. Tyndall in May 2018, she understood that USC had done nothing about her complaint.

116.   Ten years after Dr. Tyndall's violative examination, Jane Doe S.A. still feels physically ill when recounting the details of the incident. She is fearful of male gynecologists and has not seen one since that day. She has experienced emotional distress both because of Dr. Tyndall's inappropriate behavior toward her, and also because of USC's inaction. She is outraged that USC allowed Dr. Tyndall to abuse women for nearly a decade after she submitted her complaint.

117.   Jane Doe S.A. has thus been damaged by Dr. Tyndall and USC.

**7.     Jane Doe L.R. (2008)**

118.   In 2008, Jane Doe L.R. was studying for her masters in higher education at USC. She was 25 years old.

119.   In or about December of 2008, Jane Doe L.R. visited the student health center for a routine pelvic exam with Dr. Tyndall.

120.   When Jane Doe L.R. entered the exam room, she immediately felt uneasy and different than she had felt previously felt in gynecologist's offices. She noticed that there were no medical instruments on the table. The office did not feel appropriately clinical.

121.   Dr. Tyndall used his fingers to examine Jane Doe L.R. During the exam, while his fingers were inside of Jane Doe L.R., Dr. Tyndall said, "oh you're very small," in apparent reference to Jane Doe L.R.'s vagina.

122.   During the examination, while Jane Doe L.R. was unclothed, Dr. Tyndall began asking her questions about her sexual activity. His questions went beyond the question of whether or not she was sexually active—he wanted her to describe her activity. Jane Doe L.R. felt very uncomfortable, but she did not feel that she was at liberty to refuse to answer the questions.

123.   Jane Doe L.R. told Dr. Tyndall that she was sexually active with her boyfriend, to which Dr. Tyndall replied something to the effect of "what a lucky guy." During the course of their conversation, Dr. Tyndall made jokes about Jane Doe L.R.'s sexual activity.

124.    While she was unclothed, laying on the examination table, enduring Dr. Tyndall's grossly inappropriate questions and comments, Jane Doe L.R. felt like she went into shock. In order to get through the examination, she stared at a fly that was buzzing around the room. She concentrated on the fly in an effort to block out the shame, humiliation, and panic that she was feeling.

125.   After the appointment, Jane Doe L.R. walked back to her dorm room. At the time, it was winter recess, and the whole campus was empty. She remembers feeling very depressed, alone, and regretful, as if she was doing a "walk of shame."

126.   Jane Doe L.R. did not see a gynecologist for the remainder of her time at USC. She has made a point to see only female gynecologists ever since her appointment with Dr. Tyndall.

003211-11 1040903 V1

127.   In the months following appointment with Dr. Tyndall, Jane Doe L.R. experienced depression and anxiety for the first time and for which she sought treatment.

128.    After the incident, and during her time at USC, Jane Doe L.R. held a graduate assistant position at a women's center, where she worked as an advocate for victims of sexual abuse. She now holds an administrative position at a college in which she deals specifically with campus sexual assault. Looking back, Jane Doe L.R. believes that her professional choices were guided in part by her traumatic experience with Dr. Tyndall.

129.   Ever since Jane Doe L.R. saw Dr. Tyndall's face in media reports, memories of her examination have come flooding back. She is re-living the trauma of her examination with Dr. Tyndall and experiencing anger and emotional distress about USC's failure to protect its female students over multiple decades.

130.   Jane Doe L.R. has thus been damaged by USC's and Dr. Tyndall's actions.

**8.     Jane Doe R.K. (2009)**

131.   Jane Doe R.K. studied at USC from 2009 to 2012.

132.   In 2009, Jane Doe R.K. scheduled an appointment with Dr. Tyndall. She was 18 years old. She was considering becoming sexually active and wanted to explore options for birth control. At the time, Jane Doe R.K. had never been to a gynecologist.

133.   When Jane Doe R.K. told Dr. Tyndall that she had never had sexual intercourse before, he laughed and acted as though he did not believe her. She watched him type into his notes something to the effect of "virgin supposedly suspecting initial penetration." The phrasing made her feel belittled and embarrassed.

134.   After a short conversation, Dr. Tyndall prescribed Jane Doe R.K. his "favorite pill," which he claimed "all his girls loved." He did not explain the numerous

options for birth control or their potential side effects. Jane Doe R.K. felt confused, but she filled the prescription because she needed contraceptives.

135.   Jane Doe R.K. returned to Dr. Tyndall several months later because her period became irregular, and she suspected that it was because of the birth control. At the second appointment, Dr. Tyndall recommended that Jane Doe R.K. have a pelvic exam and STD testing. Jane Doe R.K. responded that she thought STD testing would be unnecessary because she and her partner had never had sex with anyone aside from each other. Dr. Tyndall replied sarcastically, saying something to the effect of "you two are in college, sure you are only having sex with each other."

136.   Dr. Tyndall did not address Jane Doe R.K.'s concerns about her irregular period or the side effects of the birth control he had prescribed. Instead, he simply prescribed a new pill.

137.   After that appointment, Jane Doe R.K. decided never to see Dr. Tyndall again. She felt disrespected, judged, and emotionally distressed.

138.   Instead of receiving healthcare from Dr. Tyndall, Jane Doe R.K. would drive an hour to see a gynecologist in her home town. Other doctors took her concerns seriously and did not make jokes about her sex life. Unlike Dr. Tyndall, they explained every exam and treatment and helped her find the contraceptive method that worked best for her.

139.   Jane Doe R.K. is outraged that USC allowed Dr. Tyndall to harass young women like herself for decades. She feels that Dr. Tyndall took advantage of her age and inexperience, and that he belittled her for his own amusement and sexual gratification.

140.   Jane Doe R.K. has thus been damaged by USC's and Dr. Tyndall's actions.

**9.    Betsayda Aceituno (2013-2015)**

141.    Betsayda Aceituno was an undergraduate student at USC from August 2013 through May 2015. During that time, she had approximately three appointments with Dr. Tyndall in the student health center.

142.    Dr. Tyndall asked Ms. Aceituno where she was from because he said she had Asian features (mostly her eyes). Ms. Aceituno responded she was not Asian, that she was Latina. Dr. Tyndall's comments about Ms. Aceituno's eyes and ethnicity made her uncomfortable and uneasy.

143.    There was a chaperone in the room for some, but not all, of Ms. Aceituno's examinations.

144.    On one occasion, Dr. Tyndall inserted his fingers into Ms. Aceituno's vagina and commented that it was "very tight" and that she "would make whoever she married very happy."  There was no chaperone present during this appointment.

145.    Dr. Tyndall's comments made Ms. Aceituno very uncomfortable and nervous. Distressed by what had occurred, Ms. Aceituno told her brother what happened.  He was also disturbed by Dr. Tyndall's comments and behavior.

146.    When Ms. Aceituno first heard reports that Dr. Tyndall had abused many women, she was horrified and immediately replayed her experiences with him.

147.    Ms. Aceituno feels extremely violated and distressed, especially considering the number of visits she had with Dr. Tyndall. She feels traumatized and angry that USC failed to provide her and other female students with safe, appropriate, and professional healthcare.

148.    Ms. Aceituno has thus been damaged by Dr. Tyndall's and USC's actions.

**10.    Jane Doe K.P. (2013)**

149.    In 2013 Jane Doe K.P. was a student at USC. She was 21 years old at the time. She scheduled an appointment with Dr. Tyndall because it had been a few years

- 24 -

since she had a women's healthcare appointment. When she called the USC student health center, she was assigned to Dr. Tyndall.

150.   Dr. Tyndall performed a pelvic exam on Jane Doe K.P. When he inserted the speculum into her vagina, he commented that she was very tight, and that the boys must love her. The comment made Jane Doe K.P. feel frightened and uncomfortable.

151.   Ever since the media has reported on Dr. Tyndall's widespread pattern of abuse, Jane Doe K.P. has felt emotionally distressed due to the memory of her examination. She is especially distressed that USC allowed Dr. Tyndall to abuse so many women throughout his years at USC.

152.   Jane Doe K.P. has thus been damaged by Dr. Tyndall's and USC's actions.

**11.     Jane Doe C.C. (2014)**

153.   Jane Doe C.C. saw Dr. Tyndall for a pelvic exam and pap smear on August 28, 2014, because she had been sexually assaulted, and she was afraid that her assailant had given her an STD.

154.   At the time, she had only previously seen a gynecologist in the OBGYN practice used by her mother.

155.   During the examination, Dr. Tyndall digitally penetrated Jane Doe C.C. This made her feel uncomfortable, but she assumed it was normal because she had very little experience with gynecologists.

156.   When Jane Doe C.C. told Dr. Tyndall the reason for her visit, he gave her one pill for chlamydia, for which she had tested positive, as well as a pill for her current partner to take.

157.   When other women in Jane Doe C.C.'s sorority experienced sexual assault, she recommended that they see Dr. Tyndall given that he had treated her STD.

158.   Ever since the news reported on Dr. Tyndall's abuse of women at USC, Jane Doe C.C. has felt enormous guilt for sending other women to him.

- 25 -

159.   Jane Doe C.C. is experiencing emotional distress because she was abused by the doctor and did not even know it due to her inexperience. She feels that USC failed her, and that the university is at fault for allowing the abuse to continue unabated for many years.

160.   Jane Doe C.C. has thus been damaged by Dr. Tyndall's and USC's actions.

**F.   The statute of limitations is tolled based on the continuing violations doctrine and fraudulent concealment.**

161.   Tyndall concealed the existence of Plaintiffs' claims and the fact that Plaintiffs had a cause of action against Tyndall and/or USC at the time his sexual assaults occurred by making a material representation(s) to Plaintiffs involving a past or existing fact by:

a.   Misrepresenting that his acts and/or conduct were for the purpose of conducting a vaginal examination;

b.   Misrepresenting that digital penetration of a woman's vagina at the outset of a gynecological examination was medically appropriate, contemporaneously and/or shortly before the abrupt, sudden, quick, and unexpected sexual assaults by Tyndall;

c.   Misrepresenting that his acts and/or conduct were for the purpose of conducting a breast examination;

d.   Misrepresenting that it was necessary for a female patient to be fully naked for a gynecologist to conduct a full body scan for skin irregularities;

e.   Misrepresenting that his acts and/or conduct were "treatments" and/or conformed to accepted medical practice.

162.   The material representation(s) to Plaintiffs and the Class were false in that Tyndall was actually performing these examinations for his own sexual gratification and pleasure.

163.   When Tyndall made the material representation(s), he knew that they were false in that he knew that the examinations were not proper, appropriate,

- 26 -

legitimate, and/or considered within standard of care by any physician of any specialty and/or gynecology.

164.   Tyndall made the material representation(s) with the intent that the material representation(s) should be acted upon by Plaintiffs and the Class in that Plaintiffs and the Class members should believe that the examinations were proper, appropriate, and legitimate; should not believe that they had been sexually assaulted; should not believe that they had been sexually assaulted so that he could prevent discovery of his sexual assaults; should continue to be seen by him so that he could continue to sexually assault them; should not question and/or report the conduct to appropriate authorities; and should not reasonably believe and not be aware of a possible cause of action that they have against Tyndall and/or USC.

165.   Plaintiffs and Class members acted in reliance upon the material representation(s) in that they:

     a.   reasonably believed that the examinations were proper, appropriate, and legitimate;

     b.   reasonably did not believe that they had been sexually assaulted;

     c.   did not believe that they should question and/or report the conduct to appropriate authorities; and,

     d.   did not reasonably believe that they had and were not aware of a possible cause of action that they had against Tyndall and/or USC.

166.   Plaintiffs and Class members suffered injury in that they could not stop the sexual assault and suffered discomfort, severe emotional distress, shock, humiliation, fright, grief, embarrassment, and disgrace.

167.   Tyndall further concealed the fraud by an affirmative act(s) that was/were designed and/or planned to prevent inquiry and escape investigation and prevent subsequent discovery of his fraud in that he:

- 27 -

a.   Misrepresented to other medical professionals in the examination room that digitally penetrating female patients was medically necessary and appropriate;

b.   Prevented other medical professionals, chaperones, and/or caregivers from being in the room during examinations and treatments of Plaintiffs and Class members so that he could sexually assault them; and

c.   Did not abide by or follow the standard of care which requires another medical professional, chaperone, parent, guardian, and/or caregiver be in the room during the examination and treatment of minors and female patients.

168.   Directors, managers, supervisors, physicians, nurses, and chaperones in USC's student-health center took affirmative steps to fraudulently conceal Tyndall's misconduct, including, but not limited to, by depressing complaints made by patients through the imposition of onerous reporting requirements on them.

169.   Directors, managers, supervisors, physicians, nurses, chaperones in USC's student-health center also misrepresented that Tyndall's conduct during examinations was proper, including, without limitation, by (i) watching Tyndall's conduct as a purported chaperone without stopping the improper conduct; (ii) permitting Tyndall to conduct examinations without a chaperone present; and (iii) scheduling female patients for appointments with Tyndall despite having full knowledge of his improper conduct.

170.   The actions and inactions of Tyndall and USC constituted fraudulent concealment.

171.   At all times pertinent to this action, Tyndall was an agent, apparent agent, servant, and employee of USC and operated within the scope of his employment and his negligence is imputed to USC.

172.   Plaintiffs and Class members did not know, could not have reasonably known, and were reasonably unaware of a possible cause of action that they had

against Tyndall and/or USC until the May 15, 2018 publication of a story by the Los Angeles Times.

## V.    CLASS ALLEGATIONS

173.   Plaintiffs bring this action pursuant to Federal Rule of Civil Procedure 23(b)(3) and 23(c)(4) on behalf of themselves and the following Class:

> All women who were examined by George Tyndall, M.D., at the University of Southern California.

174.   The Class consists of hundreds, if not thousands, of women, making joinder impracticable, in satisfaction of Fed. R. Civ. P. 23(a)(1). The exact size of the Class and the identities of the individual members are ascertainable through records maintained by USC.

175.   The claims of Plaintiffs are typical of the Class. The claims of the Plaintiffs and the Class are based on the same legal theories and arise from the same unlawful pattern and practice of sexual harassment and assault.

176.   There are many questions of law and fact common to the claims of Plaintiffs and the Class, and those questions predominate over any questions that may affect only individual Class members within the meaning of Fed. R. Civ. P. 23(a)(2) and (c)(4).

177.   Common questions of fact and law affecting members of the Class include, but are not limited to, the following:

    a.    Whether Tyndall engaged in sexual harassment, assault, and battery;

    b.    Whether Tyndall's sexual harassment, assault, and battery was committed within the scope of his employment at USC;

    c.    Whether the USC Defendants had knowledge of Tyndall's sexual harassment, assault, and battery;

d.   Whether the USC Defendants facilitated Tyndall's pattern and practice of sexual harassment, assault, and battery;

e.   Whether the USC Defendants or Tyndall engaged in conduct designed to suppress complaints or reports regarding Tyndall's conduct;

f.   Whether the USC Defendants negligently retained or supervised Tyndall;

g.   Whether the USC Defendants ratified Tyndall's conduct; and

h.   Whether the USC Defendants are responsible for Tyndall's conduct under the doctrine of respondeat superior.

178.   Absent a class action, most of the members of the Class would find the cost of litigating their claims to be prohibitive and will have no effective remedy. The class treatment of common questions of law and fact is also superior to multiple individual actions or piecemeal litigation, particularly as to USC's legal responsibility for Tyndall's actions, in that it conserves the resources of the courts and the litigants and promotes consistency and efficiency of adjudication.

179.   Plaintiffs will fairly and adequately represent and protect the interests of the Class. Plaintiffs have retained counsel with substantial experience in prosecuting complex litigation and class actions. Plaintiffs and their counsel are committed to vigorously prosecuting this action on behalf of the other respective Class members, and have the financial resources to do so. Neither Plaintiffs nor their counsel have any interests adverse to those of the other members of the Class.

003211-11 1040903 V1

# VI.   CAUSES OF ACTION

## COUNT I

### VIOLATONS OF TITLE IX, 20 U.S.C. § 1681(a), *et seq*.
### (AGAINST USC AND USC TRUSTEES)

180.   Plaintiffs restate and incorporate herein by reference the preceding paragraphs as if fully set forth herein.

181.   Title IX of the Education Amendments Act of 1972 states, "No person in the United States shall on the basis of sex, be . . . subject to discrimination under any education program or activity receiving Federal financial assistance . . . ." 20 U.S.C. § 1681, *et seq.*

182.   Plaintiffs and members of the Class are "persons" under Title IX.

183.   USC receives federal financial assistance for its education program and is therefore subject to the provisions of Title IX.

184.   USC is required under Title IX to investigate allegations of sexual assault, sexual abuse, and sexual harassment.

185.   Tyndall's conduct described above constitutes sexual harassment, abuse, and assault, and constitutes sex discrimination under Title IX.

186.   The USC Defendants were on notice of Tyndall's conduct as described above. The USC Defendants nonetheless failed to carry out their duties to investigate and take corrective action under Title IX.

187.   As a direct and proximate result of the USC Defendants' actions and/or inactions, Plaintiffs and members of the Class were damaged.

## COUNT II

### VIOLATION OF THE CALIFORNIA EQUITY IN HIGHER EDUCATION
### ACT [CAL. EDUC. CODE § 66250] (AGAINST USC, USC TRUSTEES, AND
### TYNDALL)

188.   Plaintiffs reallege and incorporate by reference the allegations contained in the previous paragraphs.

003211-11 1040903 V1

189. Section 66281.5 of the California Equity in Higher Education Act provides in pertinent part: "(a) It is the policy of the State of California, pursuant to Section 66251, that all persons, regardless of their sex, should enjoy freedom from discrimination of any kind in the postsecondary educational institution of the state. The purpose of this section is to provide notification of the prohibition against sexual harassment as a form of sexual discrimination and to provide notification of available remedies."

190. The USC Defendants' conduct as alleged herein constitutes sexual harassment as a form of sexual discrimination against Plaintiffs and the members of the Class, and violated the Equity in Higher Education Act. Plaintiffs are entitled to enforce the Act through a civil action pursuant to Education Code Section 66292.4.

191. As a result of Defendants' conduct, Plaintiffs and the members of the Class have been damaged in an amount to be proven at trial.

## COUNT III

### GENDER VIOLENCE [CAL. CIV. CODE § 52.4]
### (AGAINST TYNDALL AND USC)

192. Plaintiffs repeat and reallege the foregoing allegations as if fully set forth herein.

193. California Civil Code § 52.4 provides that gender violence is a form of sex discrimination and includes "[a] physical intrusion or physical invasion of a sexual nature under coercive conditions . . . ." *Id.* at §52.4(c)(2).

194. California Civil Code § 52.4 incorporates the definition of "gender" from California Civil Code § 51, which provides: "'Gender' means sex, and includes a person's gender identity and gender expression."

195. Here, Plaintiffs and the Class members are female.

196. Tyndall physically intruded and/or invaded the bodies of Plaintiffs and Class members during medical examinations in a sexual manner. The conditions were

coercive in that Plaintiffs and Class members were required to place their trust in their physician because he was held out to be an expert in gynecology by USC.

197.   USC participated in the physical intrusion and/or invasion of the bodies of Plaintiffs and Class members during medical examinations by being physically present in the room through agent chaperones or other clinic staff members and/or by bringing Plaintiffs and the Class members into the examination rooms and providing instructions to remove their clothing knowing that Tyndall would assault them in a sexual manner.

198.   Plaintiffs were injured as a result of the gender violence, and seek all remedies provided for in Civil Code Section 52.4(a), including, but not limited to, actual damages, compensatory, damages, punitive damages, costs, and attorneys' fees.

**COUNT IV**

**GROSS NEGLIGENCE**
**(AGAINST USC, USC TRUSTEES, AND TYNDALL)**

199.   Plaintiffs reallege and incorporate by reference the allegations contained in the previous paragraphs.

200.   The USC Defendants owed Plaintiffs and Class members a duty to use due care to ensure their safety and freedom from sexual assault, abuse, and molestation while interacting with their employees, representatives, and/or agents, including Tyndall.

201.   Tyndall owed Plaintiffs a duty of due care in carrying out medical treatment as an employee, agent, and/or representative of the USC Defendants.

202.   By seeking medical treatment from Tyndall in the course of his employment, agency, and/or representation of the USC Defendants, a special, confidential, and fiduciary relationship between Plaintiffs and Tyndall was created, resulting in Tyndall owing Plaintiffs a duty to use due care.

203.   The USC Defendants' failure to adequately supervise Tyndall, especially after USC knew or should have known of complaints regarding his nonconsensual

sexual touching and assaults during medical examinations was so reckless as to demonstrate a substantial lack of concern for whether an injury would result to Plaintiffs.

204.   Tyndall's conduct in sexually assaulting, abusing, and molesting Plaintiffs in the course of his employment, agency, and/or representation of the USC Defendants and under the guise of rendering "medical treatment" was so reckless as to demonstrate a substantial lack of concern for whether an injury would result to Plaintiffs.

205.   The USC Defendants' conduct demonstrated a willful disregard for precautions to ensure Plaintiffs' safety.

206.   The USC Defendants' conduct as described above demonstrated a willful disregard for substantial risks to Plaintiffs and Class members.

207.   The USC Defendants breached duties owed to Plaintiffs and Class members and were grossly negligent when they conducted themselves by the actions described above, said acts having been committed with reckless disregard for Plaintiffs and Class members' health, safety, constitutional and/or statutory rights, and with a substantial lack of concern as to whether an injury would result.

208.   As a direct and/or proximate result of Defendants' actions and/or inactions, Plaintiffs and Class members were damaged.

## COUNT V

### NEGLIGENT SUPERVISION AND RETENTION
### (AGAINST USC AND USC TRUSTEES)

209.   Plaintiffs restate and incorporate herein by reference the preceding paragraphs as if fully set forth herein.

210.   At all times material since 1989 and until Tyndall was removed in 2016, the USC Defendants employed Tyndall.

211.   Tyndall was unfit or incompetent to work directly with female patients and posed a particular risk of sexually harassing, violating, and assaulting them.

212.   The USC Defendants knew or should have known that Tyndall was unfit or incompetent to work directly with female patients and posed a particular risk of sexually harassing, violating, and assaulting them, and that this unfitness created a particular risk to Plaintiffs and the Class.

213.   Tyndall's unfitness and particular risk to female patients harmed Plaintiffs and the Class.

214.   The USC Defendants negligence in supervising and or retaining Tyndall was a substantial factor in causing harm to Plaintiffs and the Class.

**COUNT VI**

**CIVIL BATTERY**
**(AGAINST TYNDALL AND USC)**

215.   Plaintiffs restate and incorporate herein by reference the preceding paragraphs as if fully set forth herein.

216.   Tyndall intended to commit an act of unwanted contact and/or caused imminent apprehension of such an act against Plaintiffs and Class members. He did so by, *inter alia*:

> a.   Isolating Plaintiffs and Class members in closed quarters and dismissing any bystanders; and

> b.   Causing sexual contact.

217.   Tyndall did commit an unwanted contact with Plaintiffs and each Class member's person or property in a harmful or offensive manner, including, but not limited to, by causing molestation or sexual contact between Tyndall and each woman.

218.   Tyndall's battery of Plaintiffs and the Class caused harm, including physical, mental, and/or emotional harm of each Class Member.

219.   Tyndall's conduct was committed within the scope of his employment at USC. A causal nexus existed between Tyndall's medical examinations, USC's pattern of allowing Tyndall to examine female patients without a chaperone, and the use of his role to batter the women.  Each act of battery of a Class Member was foreseeable

- 35 -

given, *inter alia*, USC's knowledge that Tyndall failed to follow protocols concerning the use of chaperones and taking of photographs.  USC knew due to complaints from patients and staff members, and the commission of the acts at USC's student-health center.

220.   Tyndall's conduct is not so unusual or startling that it would seem unfair to include the loss resulting from it among other costs of USC's business. Assaults in the context of a medical examination, where women must subject themselves to extreme vulnerability in order to get the medical care they need, are exactly why female patients would expect physician offices and student-health centers to take extra precautions to ensure that they are protected from the dominance of a physician in the doctor-patient relationship.

221.   Holding USC liable forwards the underlying policy goals of respondeat superior, including the prevention of future injuries and assurance of compensation to victims, given that Plaintiffs and the Class members do not have separate remedies under Title VII because they were not employees of USC.

## COUNT VII

### INTENTIONAL INFLICTION OF EMOTIONAL DISTRESS
### (AGAINST TYNDALL AND USC)

222.   Plaintiffs restate and incorporate herein by reference the preceding paragraphs as if fully set forth herein.

223.   Tyndall's extreme and outrageous conduct intentionally or recklessly caused severe emotional distress to Plaintiffs and the Class members.

224.   Tyndall's outrageous conduct was not the type of ordinary physician examination or even rude or obnoxious behavior that women should be expected to tolerate. Rather, Tyndall's conduct exceeded all possible bounds of decency.

225.   Tyndall acted with intent or recklessness, knowing that his female victims were likely to endure emotional distress given the relationship and trust placed in physicians by patients.  In fact, he used this trust to subdue the women and prevent

- 36 -

them from complaining or suing based on his actions. He did so with deliberate disregard as to the high possibility that severe emotional distress would occur.

226. Tyndall's conduct caused suffering for Plaintiffs and the Class members at levels that no reasonable person should have to endure.

227. Tyndall's conduct was committed within the scope of his employment at USC. A causal nexus existed between Tyndall's medical examinations, USC's pattern of allowing Tyndall to examine female patients without a chaperone, and the use of his role to batter the women. Each act of battery of a Class Member was foreseeable given, *inter alia*, USC's knowledge that Tyndall failed to follow protocols concerning the use of chaperones and taking of photographs. USC knew due to complaints from patients and staff members, and the commission of the acts at USC's student-health center.

228. Tyndall's conduct is not so unusual or startling that it would seem unfair to include the loss resulting from it among other costs of USC's business. Assaults in the context of a medical examination, where women must subject themselves to extreme vulnerability in order to get the medical care they need, are exactly why female patients would expect physician offices and student-health centers to take extra precautions to ensure that they are protected from the dominance of a physician in the doctor-patient relationship.

229. Holding USC liable forwards the underlying policy goals of respondent superior, including the prevention of future injuries and assurance of compensation to victims, given that Plaintiffs and the Class members do not have separate remedies under Title VII because they were not employees of USC.

## COUNT VIII

### NEGLIGENT INFLICTION OF EMOTIONAL DISTRESS
### (AGAINST TYNDALL AND USC)

230. Plaintiffs restate and incorporate herein by reference the preceding paragraphs as if fully set forth herein.

- 37 -

231.   Tyndall's conduct negligently caused emotional distress to Plaintiffs and the Class members.

232.   Tyndall could reasonably foresee that his action would have caused emotional distress to Plaintiffs and the Class members.

233.   Plaintiffs and the Class members were in a specific zone of danger meeting with Tyndall in the examination room and at risk of physical harm, causing their fear when the examination became sexual in nature.

234.   Plaintiffs and the Class members, during their medical examination, suffered distress and emotional harm.

235.   Tyndall's conduct was committed within the scope of his employment at USC. A causal nexus existed between Tyndall's medical examinations, USC's pattern of allowing Tyndall to examine female patients without a chaperone, and the use of his role to batter the women.  Each act of battery of a Class Member was foreseeable given, *inter alia*, USC's knowledge that Tyndall failed to follow protocols concerning the use of chaperones and taking of photographs.  USC knew due to complaints from patients and staff members, and the commission of the acts at USC's student-health center.

236.   Tyndall's conduct is not so unusual or startling that it would seem unfair to include the loss resulting from it among other costs of USC's business. Assaults in the context of a medical examination, where women must subject themselves to extreme vulnerability in order to get the medical care they need, are exactly why female patients would expect physician offices and student-health centers to take extra precautions to ensure that they are protected from the dominance of a physician in the doctor-patient relationship.

237.   Holding USC liable forwards the underlying policy goals of respondent superior, including the prevention of future injuries and assurance of compensation to

victims, given that Plaintiffs and the Class members do not have separate remedies under Title VII because they were not employees of USC.

## COUNT IX

### RATIFICATION
### (AGAINST USC AND USC TRUSTEES)

238.   Plaintiffs restate and incorporate herein by reference the preceding paragraphs as if fully set forth herein.

239.   Tyndall was an agent and employee of USC between 1989 and 2016.

240.   Tyndall was acting at all times in his position as an agent of and on behalf of USC.

241.   All acts or omissions alleged were ratified by USC and USC Trustees. As alleged *supra*, many of USC's employees, managers, and supervisors, including other medical personnel in the student-health center, knew Tyndall was sexually abusing female students and refused to take any action to stop him. Moreover, USC's managers, supervisors, executives, and directors hid this information so Tyndall could continue to work for USC.

242.   With knowledge of Tyndall's sexual misconduct, no disciplinary action was taken and he was allowed to be alone with female students who attended USC.

243.   USC is thus responsible for Tyndall's acts of assault, battery, and intentional or negligent infliction of emotional distress.

### PRAYER FOR RELIEF

WHEREFORE, Plaintiffs, individually and on behalf of all Class members, pray that this Court:

A.      Certify the Class, name Plaintiffs as representatives of the Class, and appoint their lawyers as Class Counsel;

B.      Enter judgment against George Tyndall in favor of Plaintiffs and the Class;

- 39 -

1       C.     Enter judgment against University of Southern California in favor of

2  Plaintiffs and the Class;

3       D.     Enter judgment against the Board of Trustees of the University of

4  Southern California in favor of Plaintiffs and the Class,

5       E.     Award Plaintiffs and the Class members damages for pain and suffering,

6  and compensatory and punitive damages,

7       F.     Award Plaintiffs their attorneys' fees and costs.

8

9

10  Dated:  June 13, 2018          Respectfully submitted,

11

12            HAGENS BERMAN SOBOL SHAPIRO LLP

13            By:  */s/ Christopher R. Pitoun*

14               Christopher R. Pitoun
          301 N. Lake Ave., Suite 920

15            Pasadena, CA 91101
          Tel.: 213-330-7150

16            Fax: 213-330-7152

17            Email: christopherp@hbsslaw.com

18            Steve W. Berman (*pro hac vice to be filed*)

19            Shelby R. Smith (*pro hac vice to be filed*)
          HAGENS BERMAN SOBOL

20            SHAPIRO LLP

21            1918 Eighth Avenue, Suite 3300
          Seattle, WA 98101

22            Tel.: 206.623.7292

23            Fax: 206.623.0594
          Email: steve@hbsslaw.com

24            Email: shelby@hbsslaw.com

25

26            Elizabeth A. Fegan (*pro hac vice to be filed*)
          Emily Brown (*pro hac vice to be filed*)

27            HAGENS BERMAN SOBOL

28            SHAPIRO LLP

1

2

3

4

5

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28

455 N. Cityfront Plaza Dr., Suite 2410
Chicago, IL 60611
Telephone: (708) 628-4949
Facsimile: (708) 628-4950
Email: beth@hbsslaw.com
Email: emilyb@hbsslaw.com

- 41 -